1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAUNCEY HOLLIS, | Case No. 2:21-cv-06272-JC |
| Petitioner, | MEMORANDUM OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DISMISSING ACTION |
| v. | |
| RAYMOND MADDEN, Warden, | |
| Respondent. | |

## I.   SUMMARY

On July 28, 2021,[1] petitioner Chauncey Hollis, who is proceeding *pro se*, constructively filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition"), along with an Addendum ("Pet. Addendum").  Petitioner, who represented himself at trial and was convicted in Los Angeles County Superior Court Case No. LA078996, essentially claims

---

[1]"When a prisoner gives prison authorities a habeas petition or other pleading to mail to court, [pursuant to the mailbox rule,] the court deems the petition constructively 'filed' on the date it is signed[,]" Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010), cert. denied, 565 U.S. 897 (2011); Houston v. Lack, 487 U.S. 266, 276 (1988), which in this case was July 28, 2021.

that (1) his conviction is based in part on false evidence introduced at trial (Petition at 5; Pet. Addendum at 9-13); (2) his "trial counsel" was constitutionally ineffective (Petition at 6; Pet. Addendum at 13-15); and (3) the trial judge committed misconduct and was biased against petitioner at trial and when ruling on petitioner's habeas petition (Petition at 6; Pet. Addendum at 15-19).

On February 4, 2021, respondent filed a Motion to Dismiss the Petition on the ground that petitioner's claims are untimely.  (Docket No. 15).  Respondent lodged multiple documents, including four volumes of the Reporter's Transcript ("RT") ("Lodged Doc(s).").  (Docket Nos. 16, 20).  On May 2, 2022, the Court denied the motion and ordered respondent to file an Answer addressing the merits of the Petition.  (Docket No. 21).

On July 11, 2022, respondent filed an Answer and supporting Memorandum of Points and Authorities ("Answer Mem.") and lodged additional documents, including a Clerk's Transcript ("CT").  (Docket Nos. 28-29).  On July 18, 2022, petitioner filed a Traverse with supporting documents.  (Docket No. 30).  The parties have consented to proceed before a Magistrate Judge.  (Docket Nos. 3, 14).

For the reasons discussed below, the Court denies the Petition and dismisses this action with prejudice.

## II.   PROCEDURAL HISTORY

On May 9, 2016, a Los Angeles County Superior Court jury found petitioner – who represented himself at trial – guilty of one count of leaving the scene of an accident that resulted in permanent, serious injury (Cal. Vehicle Code § 20001(a); count 1) and two counts of reckless driving causing great bodily injury (Cal. Vehicle Code § 23104(b); counts 2-3).  (Lodged Doc. 1 at 2, 5-7; 2 CT 283-85, 288).  The jury also found that petitioner had a prior conviction for reckless driving, that he personally inflicted great bodily injury on the victims in the commission of the crime (Cal. Penal Code § 12022.7(a)-(b)), and that he had two prison priors (Cal. Penal Code § 667.5(b)).  (Lodged Doc. 1 at 2; 2 CT 283-86,

2

288-90).  On June 10, 2016, the trial court sentenced petitioner to twelve years and four months in state prison.  (Lodged Doc. 1 at 2; 2 CT 333-36).

Petitioner, through counsel, appealed in California Court of Appeal case number B276667.[2]  (See Lodged Doc. 1).  On August 24, 2016, petitioner also filed a *pro se* habeas corpus petition in the California Court of Appeal in case number B277057 (Lodged Doc. 2), which the Court of Appeal denied on May 4, 2018, for failure to state a prima facie case for relief (Lodged Doc. 3).  On the same date, on the direct appeal, the Court of Appeal remanded the case for the trial court to correct petitioner's sentence by striking the great bodily injury enhancements on counts 2 and 3 because the infliction of great bodily injury is an element of the offense defined in California Vehicle Code section 23104(b), but otherwise affirmed. (Lodged Doc. 1).  Both petitioner and his counsel then filed petitions for review of the Court of Appeal's affirmance in California Supreme Court Case No. S248784 (Lodged Docs. 4, 5), and review was summarily denied without comment on July 18, 2018 (Lodged Doc. 6).

On February 13, 2018, petitioner filed a second *pro se* habeas petition in California Court of Appeal case number B288108 (Lodged Doc. 7), which the Court of Appeal denied on February 21, 2018, on the ground that since petitioner was then represented by counsel, the claims asserted therein had to be raised by petitioner's counsel (Lodged Doc. 8).

On August 20, 2018, the Superior Court resentenced petitioner, pursuant to the Court of Appeal's remand on direct appeal, ordering that the great bodily injury enhancements imposed as to counts 2 and 3 be stricken.  (Lodged Doc. 9; see Lodged Doc. 1).

///

///

---

[2]Although petitioner had represented himself at trial, he initially had counsel on appeal.

On March 6, 2019, petitioner filed a *pro se* habeas petition in the Superior Court.  (Lodged Doc. 10).  On November 5, 2019, the Superior Court denied the petition on its merits and on procedural grounds.  (Lodged Doc. 11).

On February 3, 2020, petitioner filed a *pro se* habeas petition in California Court of Appeal case number B303958.  (Lodged Doc. 12).  On April 24, 2020, the Court of Appeal denied the petition for failure to state a prima facie case and, to the extent petitioner claimed the trial judge was biased and prejudiced against him during trial, as procedurally barred because petitioner had raised the same contention in his habeas petition in case number B277057.  (Lodged Doc. 13).

On August 4, 2020, petitioner filed a *pro se* habeas petition in California Supreme Court case number S263675 (Lodged Doc. 14), and such court denied it on January 20, 2021, without discussion or citation of authority.  (See Lodged Doc. 15).

Petitioner then sought federal habeas relief in this Court by constructively filing the pending Petition on July 28, 2021.

On December 15, 2021, during the pendency of this case, petitioner filed another *pro se* state habeas petition in California Court of Appeal case number B319001, claiming that his appellate counsel was ineffective and that petitioner's great bodily injury enhancement on count 1 should be stricken.  (Lodged Doc. 17). On February 22, 2023, the Court of Appeal granted the petition and ordered the trial court to strike the five-year enhancement on count 1 and to amend the abstract of judgment accordingly.[3]  See In re Hollis, Case No. B317001, 2023 WL 2159270 (Cal. Ct. App. Feb. 22, 2023).

///

///

///

---

[3]The relief petitioner obtained in that case is unrelated to any of the claims raised here.

4

**III.   FACTS**[4]

Kelley O'Connor picked up her friend Randy Gluck on the evening of July 13, 2014 in her Honda CR-V.  They left a yogurt shop around 9:15 or 9:30 p.m. and were driving north on the 101 freeway toward O'Connor's home.  Both O'Connor, the driver, and Gluck, the front passenger, were wearing seat belts.  O'Connor drove past Universal Studios.  That is the last thing she remembers before waking up in the hospital.

Nicholas Sacks also was driving north and west on the 101 that night, going about 70 miles per hour.  A black BMW sped past him going "at least double [that] speed."  The BMW was "weaving in and out of traffic," "moving way too fast."  Sacks did not see any car chasing or following the BMW.  The BMW changed lanes and collided with the rear bumper of O'Connor's Honda CR-V.  The Honda "flipped a few times and then shot debris everywhere."  The BMW "veered to the right and hit the guardrail."  Investigating officers later determined O'Connor's Honda had rolled about 290 feet after it was hit.

Sacks pulled to the side of the freeway.  He saw an African American man running; the man jumped over the guardrail.  Sacks looked into the BMW but no one was in the car.  Paramedics and police arrived within about 10 or 15 minutes.

Curtis Thompson was working that night at Castle Park, a miniature golf and game arcade near the freeway.  Thompson heard "cars crashing."  A few minutes later,  Thompson saw an African American man coming over a wall into the Castle Park parking lot.  The man fell over and landed on his back.  Thompson approached and asked the man if he was all right.  The man said he was fine, jumped up, and "ran straight through Castle Park all the way to the rear of the

---

[4]The Court has independently reviewed the entire state court record.  See Nasby v. McDaniel, 853 F.3d 1049, 1053 (9th Cir. 2017).  The facts set forth herein are drawn from the California Court of Appeal's decision on direct review (Lodged Doc. 1 at 7-10), and are consistent with the record.

building." Thompson followed the man through the complex, "out of the rear of the building," and through the golf course. The man then jumped over a barbed-wire-topped fence. At trial, Thompson identified petitioner as the man he had seen that night. Castle Park surveillance video also showed petitioner walking through the arcade toward the golf course.

Department of Motor Vehicles records showed that petitioner bought a 7-series BMW in 2009 and that he was still its registered owner in July 2014. According to the DMV, petitioner's car's license plate number was 6RNS925. The BMW that hit the Honda on the night of July 13, 2014 had that same license plate. DNA testing of blood on the armrest of the driver's side door as well as the air bag of the BMW matched a swab taken from petitioner. California Highway Patrol officer Jeffrey Wadsworth testified that the condition of the seat belts and air bags in the BMW showed that the driver was the only occupant at the time of the collision.

O'Connor stayed in the hospital for about nine days. She had a fractured skull, a fractured clavicle, and fractured ribs. O'Connor "had to have [her] clavicle put back together with a metal plate so it would grow back together." She had stitches for a laceration than ran about five inches down her scalp behind her right ear. Her left hand also was badly injured. Nearly two years after the collision, O'Connor still suffered pain, dizziness, and memory loss on "an everyday basis."

The collision left Gluck in a persistent vegetative state. Doctors had to remove part of his skull and brain. Nearly twenty-two months after the collision, Gluck remained in a subacute facility that cares for patients who need aggressive pulmonary care. Unable to breathe on his own, Gluck was connected to a breathing machine. He had no quality of life and his physician did not expect him to improve.

///

1   Petitioner testified at his trial.  He said the BMW belonged to his son.
2   Petitioner testified that a woman named Meisha Libine was driving, someone
3   named Jennifer was in the front passenger seat, and petitioner was in the back seat.
4   Petitioner said "some thirsty people" who had seen him "handling large amounts
5   of cash" were following him, chasing the BMW and shooting at it.  According to
6   petitioner, the Honda made an unsafe lane change that caused the collision.
7   Petitioner testified he was not wearing a seatbelt and upon impact "basically flew
8   into the front seat."  Petitioner denied knowing anyone in the Honda was injured;
9   he said he "didn't even see the Honda, period."  Petitioner testified he and the two
10  women "immediately got out," "jumped over the edge," and "slid down the hill
11  between the trees."  Petitioner told the jury he did not "even remember running
12  through that arcade," and did not know if he "blacked out or whatever."  Petitioner
13  and Libine eventually found one another and got a ride to Pasadena with an
14  unknown motorist who asked if they needed help.

15      Petitioner also called Jeffrey Kolody as a witness.  Petitioner and Kolody
16  had been housed in the same dormitory at the county jail.  Petitioner and Kolody
17  denied knowing each other, but petitioner admitted Kolody appeared as a "friend"
18  on petitioner's Facebook account.  Petitioner testified he had posted on Facebook,
19  asking if anyone had information about the collision.  Kolody testified he saw the
20  post and called petitioner's investigator.  Kolody told the jury he was on the 101
21  freeway on his motorcycle that night and saw a white or tan car trying to change
22  lanes.  Then, Kolody said, a car hit the tan or white car.  Kolody stopped his
23  motorcycle.  He testified he saw three people climb out of the driver's door of the
24  second car.  Kolody said he saw "a girl in the driver's seat."

25  **IV.   STANDARD OF REVIEW**

26      This Court may entertain a petition for writ of habeas corpus on "behalf of a
27  person in custody pursuant to the judgment of a State court only on the ground that
28  ///

1   he is in custody in violation of the Constitution or laws or treaties of the United

2   States."  28 U.S.C. § 2254(a).

3          Pursuant to 28 U.S.C. § 2254 ("Section 2254"), as amended by the

4   Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal habeas courts

5   are required to be "highly deferential" to state court decisions regarding a

6   petitioner's federal claims.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011)

7   (citation and internal quotation marks omitted).  Accordingly, when a state court

8   has adjudicated a petitioner's federal claim on the merits, federal habeas relief may

9   not be granted unless the state court's decision (1) "was contrary to, or involved an

10  unreasonable application of, clearly established Federal law, as determined by the

11  [U.S.] Supreme Court. . . ," or (2) was based on "an unreasonable determination of

12  the facts in light of the evidence presented in the State court proceeding."

13  28 U.S.C. § 2254(d); see Sexton v. Beaudreaux, 138 S. Ct. 2555, 2558 (2018)

14  (stating same) (citation omitted); Tamplin v. Muniz, 894 F.3d 1076, 1082 (9th Cir.

15  2018) (same) (citation omitted).[5]  The AEDPA standard is intentionally "difficult

16  to meet," Sexton, 138 S. Ct. at 2558 (citations and quotation marks omitted), and

17  the petitioner has the burden to show that federal habeas relief is warranted in a

18  particular case, Cullen, 563 U.S. at 181 (citation omitted).

19         In applying the foregoing standards, federal courts look to the last relevant

20  state court decision and evaluate the state court's adjudication of a federal claim

21  after an independent review of the record.  See Wilson v. Sellers, 138 S. Ct. 1188,

22  1192 (2018); Nasby v. McDaniel, 853 F.3d 1049, 1053 (9th Cir. 2017).

23  ///

24  ///

25

26          [5]When a federal claim has been presented to a state court and the state court has denied
27  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence
    of any indication or state-law procedural principles to the contrary.  Harrington v. Richter, 562
28  U.S. 86, 99 (2011).

1    **V.    DISCUSSION**

2         As noted above, the Petition essentially raises the following grounds for

3    relief:  (1) petitioner's conviction is based in part on false evidence introduced at

4    trial (Petition at 5; Pet. Addendum at 9-13) ("False Evidence Claim");[6]

5    (2) petitioner's trial counsel was constitutionally ineffective ("Ineffective

6    Assistance of Counsel Claim") (Petition at 6; Pet. Addendum at 13-15); and

7    (3) the trial judge committed misconduct and was biased against petitioner at trial

8    and when ruling on petitioner's habeas petition ("Judicial Bias Claim")  (Petition

9    at 6; Pet. Addendum at 15-19).

10        Petitioner raised these claims in a habeas petition in California Supreme

11   Court case number S263675 (Lodged Doc. 14), and such court denied the petition

12   without discussion or citation of authority (Lodged Doc. 15).  This Court generally

13   "look[s] through" the state supreme court's silent denials "to the last related

14   state-court decision that does provide a relevant rationale," and "presume[s] that

15   the unexplained decision adopted the same reasoning."  Wilson v. Sellers, 138

16   S. Ct. at 1192; Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  Here, the last

17   decision to provide a rationale was that of the California Court of Appeal in case

18   number B303958, which denied the False Evidence and Ineffective Assistance of

19   Counsel Claims for failure to state a prima facie claim for relief and denied the

20   Judicial Bias Claim because petitioner had raised the same claim in two earlier

21   petitions. (See Lodged Docs. 12-13).  In one of those earlier petitions, Court of

22   Appeal case number B277057, the court denied the Judicial Bias Claim for failure

23   to state a prima facie claim. (See Lodged Docs. 2-3).  Denial for failure to state a

24   prima facie claim is a denial on the merits and is therefore entitled to deference

25   under AEDPA.  See Ramsey v. Yearwood, 231 F. App'x 623, 625 (9th Cir.)

26

27

28        [6]Petitioner also argues for a broader standard of review for false evidence claims.  (See
     Pet. Addendum at 9, 13).  Such claim is without merit.

9

1  ("[T]he California Superior Court's finding that Ramsey's habeas petition failed
2  'to state [a] prima facie claim' is the last reasoned decision on the merits.
3  Therefore, under AEDPA, we are required to defer to the Superior Court's
4  determination."), cert. denied, 552 U.S. 918 (2007).

5  　　　Because the Court of Appeal did not further explain the basis for its
6  decisions, this Court conducts "an independent review of the record" to determine
7  whether the California Supreme Court's ultimate decision to deny petitioner's
8  claims was contrary to, or an unreasonable application of, clearly established
9  federal law.  See Murray v. Schriro, 745 F.3d 984, 996-97 (9th Cir. 2014); Walker
10 v. Martel, 709 F.3d 925, 939 (9th Cir.), cert. denied, 571 U.S. 989 (2013); see
11 also Ramsey, 231 F. App'x at 625 (where last reasoned decision on the merits was
12 a denial for failure "to state [a] prima facie claim," the court performs an
13 "independent review of the record" to ascertain whether the state court decision
14 was objectively unreasonable) (citation omitted).  "This is not de novo review of
15 the constitutional issue, but only a means to determine whether the state court
16 decision is objectively unreasonable."  Haney v. Adams, 641 F.3d 1168, 1171 (9th
17 Cir.) (citation omitted), cert. denied, 565 U.S. 1022 (2011).  "[T]he habeas
18 petitioner's burden still must be met by showing there was no reasonable basis for
19 the state court to deny relief."  Harrington v. Richter, 562 U.S. at 98.

20 　　　For the reasons explained below, petitioner is not entitled to federal habeas
21 relief on any of his claims.

22 　　**A.　　Petitioner Is Not Entitled to Federal Habeas Relief on His False**
23 　　　　　**Evidence Claim**

24 　　　　**1.　　Applicable Law**

25 　　　A "conviction obtained by the [prosecutor's] knowing use of perjured
26 testimony is fundamentally unfair, and must be set aside if there is any reasonable
27 likelihood that the false testimony could have affected the judgment of the jury."
28 Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995) (citation omitted); see also Giglio

1  v. United States, 405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court and

2  jurors by the presentation of known false evidence is incompatible with

3  'rudimentary demands of justice.'"); Miller v. Pate, 386 U.S. 1, 7 (1967) ("[T]he

4  Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the

5  knowing use of false evidence."); Napue v. Illinois, 360 U.S. 264, 269 (1959)

6  ("[I]t is established that a conviction obtained through use of false evidence,

7  known to be such by representatives of the State, must fall under the Fourteenth

8  Amendment[.]").  "In addition, the state violates a criminal defendant's right to

9  due process of law when, although not soliciting false evidence, it allows false

10  evidence to go uncorrected when it appears."  Hayes v. Brown, 399 F.3d 972, 978

11  (9th Cir. 2005) (en banc); Napue, 360 U.S. at 269.  "To prevail on a [false

12  evidence] claim, 'the petitioner must show that (1) the testimony (or evidence) was

13  actually false, (2) the prosecution knew or should have known that the testimony

14  [or evidence] was actually false, and (3) that the false testimony [or evidence] was

15  material.'"  Hein v. Sullivan, 601 F.3d 897, 908 (9th Cir. 2010) (alterations in

16  original), cert. denied, 563 U.S. 935 (2011); Napue, 360 U.S. at 269.  A false

17  evidence claim "succeeds only if [all] three elements are satisfied."[7]  Panah v.

18  Chappell, 935 F.3d 657, 664 (9th Cir. 2019), cert. denied, 141 S. Ct. 273 (2020).

19         **2.    Analysis**

20         Petitioner claims that the prosecutor presented false evidence that petitioner

21  was the driver of the vehicle that caused the accident, assertedly despite the

22  prosecution's awareness of evidence and a material witness that supported

23  petitioner's defense that he was not the driver.  (Petition at 5; Pet. Addendum at

24  9-13; Traverse at 12).  Petitioner's claim rests mainly on a January 2019

25

26         [7]This is the applicable standard for demonstrating a federal constitutional violation based
   on the prosecution's use of false evidence at trial.  To the extent petitioner argues that a different,
27  lower standard should apply here based on state law (see Pet. Addendum at 11-12), the argument
   fails because federal habeas relief is available only for violations of clearly established *federal*
28  law, as noted above.

declaration of Gia King, a purported witness who was interviewed by the prosecutor's office before the trial but was not called to testify.  (See Pet. Addendum at 6, 9, 11, 12; Lodged Doc. 10, Ex. C).  King's declaration states that (1) she was present at a gathering at the Rose Bowl in Pasadena on July 13, 2014, and witnessed petitioner leaving the gathering with "Meisha" and another young woman; (2) she saw petitioner get into the back seat of a black BMW, with "Meisha" driving and the second woman in the passenger seat; (3) shortly after leaving, King noticed a car following the BMW and called petitioner to notify him; (4) shortly after learning of the accident, King was contacted by the district attorney's office regarding the events of that night, and King reported that "Meisha" had been driving the black BMW when they left the gathering; (5) when she did not hear from the district attorney's office again, she called the office of petitioner's trial counsel, Geragos & Geragos, to relay the information about her call with the district attorney's office and her observations of the night of the incident; and (6) although she was prepared to testify as to these facts, she was never called to the stand to testify in petitioner's case.  (Lodged Doc. 10, Ex. C).

In addition, petitioner references a November 2018 declaration of Lameaysha Bell, who claims she was the BMW's driver, while petitioner and another woman, Jennifer, were with her in the car.  (See Pet. Addendum at 6, 9, 12; Lodged Doc. 10, Ex. B).  Bell's declaration states that after the crash, she, petitioner, and Jennifer all jumped out of the car and ran, and Bell was too scared to come forward later.  (Lodged Doc. 10, Ex. B).[8]  Unlike with Gia King, there is no indication that Bell ever spoke with the prosecution's office or that the prosecution was ever aware of her identity before or during petitioner's trial.

---

[8]Copies of Gia King's and Lameaysha Bell's declarations were submitted as Exhibits B and C, respectively, in support of petitioner's habeas petitions in the Superior Court (Lodged Doc. 10), the Court of Appeal (Lodged Doc. 12), and the California Supreme Court (Lodged Doc. 14).

1    Even assuming King's and Bell's respective statements are credible,

2    petitioner has not shown that the prosecution knew or should have known that any

3    of its evidence was false.  See United States v. Pelisamen, 641 F.3d 399, 408 (9th

4    Cir. 2011) (rejecting a perjured testimony claim when, among other things,

5    "[n]othing in the record supports an inference that the government knew that [the]

6    testimony . . . was 'false.'").  Although King reportedly told the prosecution she

7    saw "Meisha" driving petitioner's vehicle when they left the Rose Bowl that night,

8    the prosecution's forensic evidence and witness testimony from the scene of the

9    accident indicated that only petitioner was driving when the crash occurred.[9]

10   Specifically, as noted above, petitioner's DNA matched the blood on the airbag

11   and the arm rest of the driver's side door, and a California Highway Patrol officer

12   testified that the conditions of the seat belts and air bags showed that the driver

13   was the car's only occupant during the crash.  (See Lodged Doc. 1 at 8-9; 2 RT

14   377-80; 3 RT 702-05, 718-21).  That evidence corroborated the prosecution's

15   eyewitness testimony, including that of the bystander, Sacks, who testified that he

16   saw the BMW crash into the Honda and hit the guardrail, and he then saw just one

17   person, an African American man, who was running and then jumped over the

18   guardrail. (Lodged Doc. 1 at 8; 2 RT 362-64, 372).  Sacks stated that when he

19   then looked into the BMW, it was empty.  (Lodged Doc. 1 at 8; 2 RT 365).

20   Petitioner argues that the prosecution had an ethical and professional duty

21   not to pursue its case against petitioner after receiving Gia King's statement that

22   petitioner was not the driver of the vehicle.  (Traverse at 12-13).  However, habeas

23   relief is available only for violations of petitioner's clearly established federal

24   rights, not for mere breaches of ethical or professional duties.  Here, even to the

25   extent that King's statement may have contradicted the prosecution's evidence,

26

27       [9]As respondent points out, none of the prosecution's trial witnesses testified that they
     actually saw petitioner driving.  (Answer Mem. at 11).  As such, no prosecution witness directly
28   contradicted King's declaration.

13

1   petitioner had no clearly established federal right to be free from prosecution

2   where there was contradictory evidence of his guilt.  Because petitioner cannot

3   demonstrate that the prosecution knew or should have known its evidence was

4   false, he fails to support his false evidence claim.  See Sanders v. Cullen, 873 F.3d

5   778, 801 (9th Cir. 2017) (affirming denial of alleged false testimony claim when

6   petitioner "did not support the claim that [the witness] lied or that the prosecution

7   knew his testimony was false"), cert. denied, 139 S. Ct. 798 (2019); Morales v.

8   Woodford, 388 F.3d 1159, 1179 (2004) ("The essence of the due process violation

9   is misconduct by the government, not merely perjury by a witness.  Morales,

10  however, sets out no factual basis for attributing any misconduct, any knowing

11  presentation of perjury, by the government.  Thus there is no basis for granting the

12  writ even if [the witness] did lie.") (footnote omitted), cert. denied, 546 U.S. 935

13  (2005).

14      Notably, petitioner does not argue that Gia King's statement constituted

15  exculpatory evidence that the prosecution failed to disclose to the defense in

16  violation of Brady v. Maryland, 373 U.S. 83 (1963).  A Brady claim would clearly

17  fail, as the record reflects that petitioner was aware of King's statements before

18  trial and therefore could not have been significantly prejudiced by any

19  nondisclosure on the part of the prosecution.[10]  See Jackson v. Brown, 513 F.3d

20  1057, 1071 (9th Cir. 2008) (Brady claim requires demonstrating three elements:

21  "(1) The evidence at issue must be favorable to the accused . . . , (2) that evidence

22  must have been suppressed by the State, and (3) prejudice must have ensued.")

23  (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)) (internal quotations

24  omitted).  King herself stated in the 2019 declaration that she contacted

25  petitioner's then-counsel soon after speaking with the district attorney's office.

26

27

28      [10]Even if his claim could be construed as such, petitioner does not appear to have
    exhausted any Brady claim on this basis.

14

Before the trial, moreover, a court-appointed investigator for petitioner interviewed King via telephone on February 11, 2016, and reported the results of that interview in a letter to petitioner dated February 16, 2016, which petitioner attached to his August 2016 habeas petition in the Court of Appeal.  (See Lodged Doc. 2 at 17-18).

In addition, even if petitioner's claim is construed as a claim of actual innocence based on new evidence (*i.e.*, Lameaysha Bell's 2018 declaration and Gia King's 2019 declaration), the claim still fails.  Although it remains unclear whether a freestanding claim of actual innocence is cognizable on federal habeas review, the Ninth Circuit has observed that the proof required to establish such a claim is "extraordinarily high."  Jones v. Taylor, 763 F.3d 1242, 1246 (9th Cir. 2014) (citing Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc), cert. denied, 523 U.S. 1133 (1998)).[11]  Specifically, "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."  Carriger, 132 F.3d at 476 (citing Herrera v. Collins, 506 U.S. 390, 442-44 (1993) (Blackmun, J., dissenting)).  An actual innocence claim must be supported with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  Schlup v. Delo, 513 U.S. 298, 324 (1995).  The evidence must be "truly persuasive."  Carriger, 132 F.3d at 476 (quoting Herrera, 506 U.S. at 417).  In addressing a freestanding actual innocence claim, a "federal habeas court 'must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it

---

[11]The United States Supreme Court has expressly left open the question of whether a freestanding claim of actual innocence is cognizable on federal habeas review.  See McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.") (citation omitted).  The Ninth Circuit has assumed, without deciding, that such a claim could support habeas relief.  Jones v. Taylor, 763 F.3d at 1246.

1  would necessarily be admitted under rules of admissibility that would govern at

2  trial.'" Jones, 763 F.3d at 1247 (quoting House v. Bell, 547 U.S. 518, 538 (2006))

3  (citation and internal quotation marks omitted).  On this record, the court "must

4  make a 'probabilistic determination about what reasonable, properly instructed

5  jurors would do.'"  House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 329).

6       Here, although petitioner's new evidence might have helped corroborate his

7  own testimony that he was not the driver, it is not "truly persuasive" and does not

8  "affirmatively prove that he is probably innocent."  Carriger, 132 F.3d at 476

9  (citation omitted).  First, there are multiple discrepancies which limit the

10 persuasiveness of the 2018 and 2019 declarations submitted by petitioner.  For

11 example, while petitioner testified that "Meisha Libine" drove the BMW that

12 collided with the victim's car (see RT 1256, 1305-06),[12] the declaration offered by

13 petitioner is from "Lameaysha Bell," who claims to have been the driver.

14 Moreover, whereas King's 2019 declaration states that King saw petitioner get

15 into the back seat of the BMW, with "Meisha" driving and another person, "a

16 young white female," also in the car when petitioner left, with another car

17 apparently following the BMW (Lodged Doc. 10, Ex. C), the defense

18 investigator's 2016 interview with King gives no indication that King saw

19 petitioner leave with Meisha behind the wheel, nor does it mention seeing a third

20 person in the vehicle with them or another car suspiciously following them

21 (Lodged Doc. 2 at 17-18).[13]  In addition, as summarized above, the prosecution

22

23  _____

24       [12]Petitioner repeated multiple times at trial that her last name was "Libine" and spelled it
     out as such for the record.  (See RT 1305-06).

25       [13]According to the investigator's report, King said that "Misha [sic] was the driver of the
26  BMW and Hollis was her passenger when they all met at the Rose Bowl in Pasadena" (Lodged
     Doc. 2 at 17), but the report does not mention that King saw petitioner leave, that she observed
27  who was driving petitioner's car at that point, or that she ever saw any other car following
     petitioner's car.  Instead, it states that at about 1:00 p.m., King herself "left the group that was at
28                                                                                    (continued...)

presented strong evidence of petitioner's guilt at trial, including forensic evidence

indicating that petitioner was the driver at the time of the crash, as well as other

testimony indicating that only one person was in the car at the time of the crash.

(See Lodged Doc. 1 at 8-9; 2 RT 362-65, 372, 377-80; 3 RT 702-05, 718-21).

Petitioner therefore fails adequately to support any credible claim of actual

innocence.[14]

Accordingly, the California Supreme Court's denial of petitioner's False

Evidence Claim was not contrary to, and did not involve an unreasonable

application of, clearly established federal law, and was not based on an

unreasonable determination of the facts in light of the evidence presented.

---

[13](...continued)
the Rose Bowl and began to drive back [to] the motel she was staying in[]" when she "noticed
that a car was following[,] causing her alarm." (Lodged Doc. 2 at 17).  King stated that petitioner
called her later that night and told her that he and "Misha" had been in an accident and were at
the hospital, but "[t]here was no discussion about what happened in the accident, who was
driving or anything else." (Lodged Doc. 2 at 18).  "Misha" called King at a later date, and King
"confirmed Misha told her she was in fact the driver of the BMW at the time of the auto accident
in which [petitioner] was a passenger," but Misha "never explained to King the specifics of the
accident." (Lodged Doc. 2 at 18).

[14]Respondent contends that any freestanding actual innocence claim here is barred by
Teague v. Lane, 489 U.S. 288 (1989).  (See Answer Mem. at 11-14).  The Teague rule is a
"nonretroactivity principle" that "prevents a federal court from granting habeas corpus relief to
a state prisoner based on a rule announced after his conviction and sentence became final."
Caspari v. Bohlen, 510 U.S. 383, 389 (1994).  However, Teague applies to bar retroactive
application of procedural rules, not substantive rules.  Montgomery v. Louisiana, 577 U.S. 190,
200 (2016) ("[W]hen a new substantive rule of constitutional law controls the outcome of a case,
the Constitution requires state collateral review courts to give retroactive effect to that rule");
Schriro v. Summerlin, 542 U.S. 348, 352 & n.4 (2004).  District courts in this Circuit generally
have concluded that a freestanding actual innocence claim is a substantive claim and is therefore
not barred by Teague.  See, e.g., Diaz v. Madden, 2022 WL 18599597, at *50 (C.D. Cal. Aug.
17, 2022), report and recommendation adopted, 2023 WL 130754 (C.D. Cal. Jan. 6, 2023);
Ewalan v. Holbrook, 2022 WL 1477557, at *28 (W.D. Wash. Mar. 28, 2022), report and
recommendation adopted, 2022 WL 1469503 (W.D. Wash. May 10, 2022); Quiroz v. Pfeiffer,
2021 WL 3816358, at *5 (C.D. Cal. May 14, 2021), report and recommendation adopted, 2021
WL 3796433 (C.D. Cal. Aug. 26, 2021).

1      **B.**      **Petitioner Is Not Entitled to Federal Habeas Relief on His**

2            **Ineffective Assistance of Counsel Claim**

3         **1.**      **Applicable Law**

4        "The Sixth Amendment guarantees criminal defendants the effective

5 assistance of counsel." Yarborough v. Gentry, 540 U.S. 1, 4 (2003) (per curiam);

6 see also Missouri v. Frye, 566 U.S. 134, 138 (2012) ("The right to counsel is the

7 right to effective assistance of counsel."). To warrant habeas relief on an

8 ineffective  assistance of counsel claim, a petitioner must demonstrate both that:

9 (1) counsel's performance was deficient, falling below "an objective standard of

10 reasonableness"; and (2) counsel's deficient performance prejudiced the petitioner

11 (*i.e.*, "there is a reasonable probability that, but for counsel's unprofessional errors,

12 the result of the proceeding would have been different"). Strickland v.

13 Washington, 466 U.S. 668, 687-88, 694 (1984); see also Cullen, 563 U.S. at 189

14 (Strickland standard is clearly established federal law). As both prongs of the

15 Strickland test must be satisfied to establish a constitutional violation, the failure

16 to satisfy either prong requires that an ineffective assistance claim be denied.

17 Strickland, 466 U.S. at 697, 700.

18        There is a "strong presumption" that an attorney's representation falls

19 within "the wide range of reasonable professional assistance." Harrington v.

20 Richter, 562 U.S. at 104 (citation omitted); see also Strickland, 466 U.S. at 689

21 ("Judicial scrutiny of counsel's performance must be highly deferential."). The

22 presumption is overcome only when an attorney error was so egregious that

23 counsel's representation ultimately "amounted to incompetence under 'prevailing

24 professional norms.'" Richter, 562 U.S. at 105 (citation omitted); see also

25 Maryland v. Kulbicki, 577 U.S. 1, 2 (2015) (per curiam) (attorney performance

26 deficient where errors are "so serious" that attorney "no longer functions as

27 'counsel'" contemplated by the Sixth Amendment) (citing Strickland, 466 U.S. at

28 687). Courts judge the reasonableness of an attorney's conduct "on the facts of

1  the particular case, viewed as of the time of counsel's conduct." <u>Strickland</u>, 466

2  U.S. at 690.  Courts may not simply "second-guess" an attorney's trial strategy.

3  <u>Daire v. Lattimore</u>, 818 F.3d 454, 465 (9th Cir. 2016).

4      Deficient performance is prejudicial if "there is a reasonable probability

5  that, but for counsel's unprofessional errors, the result of the proceeding would

6  have been different." <u>Strickland</u>, 466 U.S. at 694.  A reasonable probability is one

7  that is "sufficient to undermine confidence in the outcome" of the trial.  <u>Id.</u>  The

8  likelihood that a verdict would have been different "must be substantial, not just

9  conceivable." <u>Richter</u>, 562 U.S. at 112 (citation omitted).

10      Furthermore, as here, where there has been a state court decision rejecting a

11  <u>Strickland</u> claim, review is "doubly deferential." <u>Richter</u>, 562 U.S. at 105 (citing

12  <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123-24 (2009)).  Federal habeas relief is

13  available only if "fairminded jurists" could not disagree that the state court

14  misapplied <u>Strickland</u>'s deferential standard.  <u>Id.</u> at 102.  "The pivotal question is

15  whether the state court's application of the <u>Strickland</u> standard was unreasonable."

16  <u>Id.</u> at 101.  "[E]ven a strong case for relief does not mean the state court's contrary

17  conclusion was unreasonable."  <u>Id.</u> at 102 (citation omitted).  The range of

18  reasonable <u>Strickland</u> applications is "substantial."  <u>Id.</u> at 105.

19          **2.    Analysis**

20      Petitioner claims his former counsel – Hagop Kuyumjian of the Geragos &

21  Geragos law firm – was constitutionally ineffective because he failed to interview

22  Lameaysha Bell and Gia King before trial.[15]  (Petition at 6; Pet. Addendum at

23

24      [15]As explained above, over two years after his conviction, petitioner obtained declarations

25  from Bell and King which corroborate, to some degree, petitioner's trial testimony that he was

26  not driving at the time of the crash – though, at trial, petitioner stated that the driver was a

27  woman named "Meisha Labine" (<u>see</u> 4 RT 1256), whereas Lameaysha Bell now attests that it

28  was she (<u>see</u> Lodged Doc. 10, Ex. B).  As also noted above, Gia King's declaration states that she

    saw "Meisha" driving and petitioner in the back seat earlier that night and that she contacted

                                                                    (continued...)

13-15; Traverse at 14-15).  Petitioner asserts that he "specifically informed counsel not only of the fact that 'Meisha' had been driving the vehicle when they left the gathering at the Rose Bowl (subsequently colliding with the Honda CR-V), but also that witnesses, [up] to and including Gia King, could attest to these facts." (Pet. Addendum at 13-14).  Petitioner contends that his counsel "repeatedly failed to perform" his "basic duty to identify and interview these witnesses."  (Pet. Addendum at 14).

However, petitioner was not represented by the Geragos & Geragos firm at trial, as petitioner acknowledges.  Instead, counsel represented petitioner from the time of his arraignment on February 18, 2015, until January 28, 2016, at which time he was relieved of counsel and petitioner was permitted to represent himself.[16]  (See Lodged Doc. at 1 at 3-7; 2 CT 165-66, 195-202; 2 RT C-1 to C-2).  Petitioner thus represented himself from that point forward, including at trial, which began about three months later, on April 26, 2016.

Petitioner asserts that his pretrial counsel's deficient investigation "forced petitioner into the untenable position of retaining new counsel (untenable in light of the exorbitant fees paid to the Geragos firm), o[r] to self-represent."  (Pet. Addendum at 15).  However, petitioner cannot plausibly blame his pretrial counsel for his own decision to forego representation altogether.  Petitioner had a Sixth Amendment right to be represented by counsel, and – as the California Court of Appeal reasonably concluded on direct appeal – he knowingly and intelligently waived that right, after having been properly informed of the benefits he was giving up and of the disadvantages of self-representation, including the difficulties

---

[15](...continued)
Geragos & Geragos shortly after the crash to relay her observations "but was never actually called to the stand."  (See Lodged Doc. 10, Ex. C).

[16]Petitioner was in custody at that time and remained in custody thereafter.  (See Lodged Doc. 1 at 4 n.4).

1  of investigating the case and preparing for trial while petitioner remained in
2  custody.  (See Lodged Doc. 1 at 11-17; 2 CT 197-99; 2 RT C-2 to C-9); see also
3  Faretta v. California, 422 U.S. 806, 835 (1975) ("When an accused manages his
4  own defense, he relinquishes, as a purely factual matter, many of the traditional
5  benefits associated with the right to counsel.  For this reason, in order to represent
6  himself, the accused must 'knowingly and intelligently' forgo those relinquished
7  benefits.").  As the Court of Appeal pointed out, the trial court "engaged in a
8  lengthy colloquy" with petitioner regarding his decision, further advising him that
9  he "would have limited access to research materials" without counsel, "and that if
10  convicted he would not be able to claim ineffective assistance of counsel."
11  (Lodged Doc. 1 at 14-15; 2 RT C-6 to C-9).  Petitioner nonetheless committed to
12  that decision, though certainly not unaware of his options.  On the first day of trial,
13  the court asked petitioner if he "wish[ed] to have a lawyer appointed" to represent
14  him and to "relinquish [his] pro per status," but petitioner said no.  (2 RT 9-10).
15  He also refused the assistance of stand-by counsel at trial.  (See 2 CT 214).

16      Having decided to represent himself, petitioner cannot now complain that
17  his own deficient trial defense resulted from pretrial counsel's failure to
18  investigate, particularly as petitioner had ample opportunity to correct such
19  failures after being relieved of counsel.  See Faretta, 422 U.S. at 834 n.46 ("[A]
20  defendant who elects to represent himself cannot thereafter complain that the
21  quality of his own defense amounted to a denial of 'effective assistance of
22  counsel.'"); Cook v. Ryan, 688 F.3d 598, 609 (9th Cir.) ("Even if Cook's pretrial
23  counsel performed deficiently during the seven months he represented Cook . . . ,
24  Cook could have corrected those errors once he decided to represent himself.
25  Faretta therefore precludes Cook from complaining about the 'quality of his own
26  defense.'") (footnote omitted), cert. denied, 567 U.S. 958 (2012); Whiteside v.
27  Ryan, 2019 WL 6468495, at *4 (D. Ariz. Nov. 5, 2019) (rejecting claim that
28  pretrial counsel provided ineffective assistance by failing to investigate, as

petitioner gave no reason why he could not have completed sufficient investigation during the several months before trial when he represented himself and had an investigator to assist him), report and recommendation adopted, 2019 WL 6464753 (D. Ariz. Dec. 2, 2019); Perry v. Beard, 2014 WL 5035943, at *13 (E.D. Cal. Oct. 8, 2014) (rejecting claim of ineffective assistance of pretrial counsel because "it was Perry's lack of action when serving as his own counsel that was ineffective") (citing Cook, 688 F.3d at 609).

Petitioner cannot demonstrate that counsel's assertedly deficient investigation actually prevented petitioner from obtaining witness interviews or presenting witnesses at trial, when he was no longer represented by counsel.  Nor can he show that a more thorough investigation by counsel would have caused Gia King or Lameaysha Bell to testify at trial.  In the nearly three-month period before trial when petitioner was representing himself, he had the assistance of a court-appointed investigator (Michael Florio) (see 2 CT 201; 2 RT C-10), who interviewed Gia King by telephone on February 11, 2016 (see Lodged Doc. 2 at 17-18), as indicated above.  Petitioner and his investigator were also in contact with King during the trial and were attempting to have her come and testify, until petitioner ultimately decided that he wished to proceed without her testimony.  Specifically, on Monday, May 2, 2016, after the prosecution had rested, petitioner and his investigator told the Court that King was driving that day from Fresno, California, to testify.[17]  (See 4 RT 1249-51, 1272, 1306).  When trial resumed the next day, Tuesday, May 3, 2016, petitioner stated:  "Gia, she's not going to make it.  She made it, and she said she got here and got a blow out on her tire.  She contacted the investigator."  (4 RT 1501).  When the trial court then asked if

---

[17]According to the investigator's 2016 pretrial interview report, King "d[id] not want to return to S[outhern] California to testify because she d[id] not think she c[ould] add anything to the case and because her father [was] ill who also lives in N[orthern] California."  (Lodged Doc. 2 at 18).

1    petitioner intended to call her, petitioner answered: "No. I want to move forward

2    without her." (4 RT 1502). Given that petitioner himself was in contact with

3    King and chose to proceed without her testimony at trial, he certainly cannot claim

4    that he was prejudiced by pretrial counsel's failure to interview King more than

5    three months before trial. Cf. Cook, 688 F.3d at 612 ("[W]hether Cook's pretrial

6    counsel had developed further mitigation information would have made no

7    difference given that Cook already knew the information but affirmatively chose

8    not to present it.") (citation omitted).

9         Petitioner also cannot blame pretrial counsel for failing to contact

10   Lameaysha Bell. First, petitioner apparently did not know her correct name at that

11   time and instead testified at trial that "Meisha Libine" was the driver of the

12   vehicle, as noted above.[18] (See 4 RT 1256). Yet, petitioner's trial testimony also

13   suggested he was in contact with "Meisha" but could not persuade her to appear.

14   He stated during his trial testimony on May 2, 2016: "Meisha is not here, and I

15   tried to get her to come to court, and she's refusing. She think[s] she's going to

16   get locked up. And I don't blame her." (4 RT 1290). Given this testimony,

17   petitioner cannot show that any competent counsel would have been able to obtain

18   Bell as a trial witness. See United States v. Harden, 846 F.2d 1229, 1231-32 (9th

19   Cir.) (rejecting a claim of ineffective assistance based on the failure to call a

20   witness . . . because there was "no evidence in the record which establishes that

21   [the witness] would testify in [petitioner's] trial"), cert. denied, 488 U.S. 910

22   (1988).

23        Accordingly, the state courts' rejection of petitioner's Ineffective Assistance

24   of Counsel Claim was not contrary to, and did not involve an unreasonable

25   ///

26

27

28        [18]Petitioner's investigator's 2016 report of the interview with Gia King refers to the driver
     as "a woman named Misha [LaBelle]." (Lodged Doc. 2 at 17) (alteration in original).

1   application of, clearly established federal law, and was not based on an

2   unreasonable determination of the facts in light of the evidence presented.

3       **C.   Petitioner Is Not Entitled to Federal Habeas Relief on His**
          **Judicial Bias Claim**

4

5           **1.   Applicable Law**

6           "[T]he Due Process Clause clearly requires a 'fair trial in a fair tribunal,'

7   before a judge with no actual bias against the defendant or interest in the outcome

8   of his particular case." Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (internal

9   citation omitted); In re Murchison, 349 U.S. 133, 136 (1955); see also Ungar v.

10  Sarafite, 376 U.S. 575, 584 (1964) (petitioner has a "right to be tried by an

11  unbiased and impartial judge without a direct personal interest in the outcome of

12  the hearing").  "There is a strong presumption that a judge is not biased or

13  prejudiced." Rhoades v. Henry, 598 F.3d 511, 519 (9th Cir. 2010) (citation

14  omitted); Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir.), cert. denied, 555

15  U.S. 871 (2008).

16          Generally, bias cannot be demonstrated based merely on "judicial rulings,

17  routine trial administration efforts, and ordinary admonishments (whether or not

18  legally supportable) to counsel," including "judicial remarks during the course of a

19  trial that are critical or disapproving of, or even hostile to, counsel, the parties, or

20  their cases," along with "expressions of impatience, dissatisfaction, annoyance,

21  and even anger, that are within the bounds of what imperfect men and women . . .

22  sometimes display." Liteky v. United States, 510 U.S. 540, 555-56 (1994).  On

23  the other hand, judicial remarks may evince bias "if they reveal an opinion that

24  derives from an extrajudicial source" or "if they reveal such a high degree of

25  favoritism or antagonism as to make fair judgment impossible." Id. at 555.

26          On habeas review of a state conviction, judicial misconduct will warrant

27  habeas relief only where "the state trial judge's behavior rendered the trial so

28  fundamentally unfair as to violate federal due process under the Untied States

1  Constitution." Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995), cert. denied,
2  517 U.S. 1158 (1996).

3           **2.**    **Analysis**

4        Petitioner claims the trial court committed misconduct and was biased
5  against petitioner at trial and when ruling on his habeas petition.  (Petition at 6;
6  Pet. Addendum at 15-19).  However, petitioner fails to support this with any facts
7  plausibly showing judicial bias or misconduct.  Instead, the claim seems to rest
8  mainly on petitioner's displeasure with the trial judge's rulings and attitude toward
9  petitioner, which all appear to have been within permissible bounds and free of
10 evident bias.  For example, petitioner complains of the trial court's "refusal to
11 recognize, despite Petitioner's on the record statements, that the law firm of
12 Geragos & Geragos had abandoned petitioner's cause, refusing to investigate
13 known witnesses and by constantly seeking more and more financial
14 compensation."  (Pet. Addendum at 15; Traverse at 16).  He also alleges that the
15 trial judge "spoke loudly and harshly to petitioner in front of the jury, exhibited
16 clear hostility towards the defense, and displayed an unmistakable and implicit
17 bias towards petitioner's state and federal constitutional rights."  (Pet. Addendum
18 at 15).  However, as noted above, judicial remarks showing impatience,
19 annoyance, or hostility generally do not suffice to demonstrate bias or misconduct
20 warranting relief, and petitioner has failed to point to any remarks that "reveal an
21 opinion that derives from an extrajudicial source" or "reveal such a high degree of
22 favoritism or antagonism as to make fair judgment impossible."  See Liteky, 510
23 U.S. at 555-56 (1994); see also Larson v. Palmateer, 515 F.3d at 1067 ("In the
24 absence of any evidence of some extrajudicial source of bias or partiality, neither
25 adverse rulings nor impatient remarks are generally sufficient to overcome the
26 presumption of judicial integrity, even if those remarks are 'critical or
27 disapproving of, or even hostile to, counsel, the parties, or their cases.'  Because
28 Larson has provided no evidence of the trial court's alleged bias outside of . . .

rulings and remarks – which themselves revealed little more than the occasional mild frustration with Larson's pro se lawyering skills – his claim that he was denied a fair trial also fails.") (internal citations omitted).

Petitioner further contends that the trial court's 2019 decision denying habeas relief exhibited racial bias in the following statement:  "In a nutshell, Petitioner's defense at trial was he was not the driver of the BMW, it was a female named Meisha Libine (*accompanied by a young white female passenger, petitioner is a black African American*) causing the collision and catastrophic injuries."  (Lodged Doc. 11 at 2) (emphasis added).  Petitioner asserts that the trial court in this remark "explicitly expressed a bias towards white women who accompany black men, and vice versa," evoking a history of racist stereotypes. (Pet. Addendum at 7, 16-19).  In context, however, there is nothing in the trial court's decision to suggest that this mere reference to the respective races of petitioner and the female passenger was intended to evoke offensive stereotypes in any respect or was meant as anything more than a cursory (and perhaps unnecessary) physical description to distinguish the alleged occupants of the vehicle.  Petitioner himself referred to this female passenger as "a white girl" in his trial testimony.  (See 4 RT 1256).  Moreover, Gia King's 2019 declaration – which petitioner had submitted to the trial court in support of his habeas petition – describes having seen "Meisha and *a young white female* enter [petitioner's] BMW" on the evening of the crash.  (Lodged Doc. 10, Ex. C) (emphasis added).

Absent any clear indication in the record that the trial judge was motivated by racial prejudice or any other improper bias, petitioner fails to show that judicial misconduct rendered his state court proceedings fundamentally unfair.  Therefore, the state courts' rejection of petitioner's Judicial Bias Claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented.

**VI.    ORDERS**

  For the foregoing reasons, IT IS ORDERED that the Petition is denied on its merits, this action is dismissed with prejudice, and Judgment shall be entered accordingly.

  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment herein on petitioner and counsel for respondent.

  IT IS SO ORDERED.

DATED:    June 5, 2023

              /s/

         Honorable Jacqueline Chooljian
         UNITED STATES MAGISTRATE JUDGE

27